Jason E. Mueller (*pro hac vice*)
*JMueller@SheppardMullin.com*
Galyn D. Gafford (*pro hac vice*)
*GGafford@SheppardMullin.com*
Robert E. Hough, II (*pro hac vice*)
*RHough@SheppardMullin.com*
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2200 Ross Avenue, 24th Floor
Dallas, TX  75201-6776
Telephone:      (469) 391-7400
Facsimile:      (469) 391-7401

Yasamin Parsafar (State Bar No. 287617)
*YParsafar@SheppardMullin.com*
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Four Embarcadero Center, 17th Floor
San Francisco, CA  94111-4109
Telephone:      (415) 434-9100
Facsimile:      (415) 434-3947

Attorneys for Plaintiff and Counterdefendant
PACIFIC COAST BUILDING PRODUCTS, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| PACIFIC COAST BUILDING PRODUCTS, INC., <br><br> Plaintiff, <br><br> v. <br><br> CERTAINTEED GYPSUM, INC. and SAINT GOBAIN PERFORMANCE PLASTICS CORP., <br><br> Defendants. <br> AND RELATED COUNTERCLAIMS. | Case No. 5:18-cv-00346 <br><br> **PACIFIC COAST BUILDING PRODUCTS, INC.'S OPENING CLAIM CONSTRUCTION BRIEF PURSUANT TO PATENT LOCAL RULE 4-5** <br><br> Hon. Lucy H. Koh <br><br> Hearing Date:      November 29, 2018 <br> Hearing time:      1:30 p.m. |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................1

II.  OVERVIEW OF THE TECHNOLOGY ............................................................1

    A.  U.S. Patent No. 9,388,568 .....................................................................1

    B.  U.S. Patent No. 8,181,738 .....................................................................2

III.  ARGUMENT ....................................................................................................2

    A.  U.S. Patent No. 9,388,568 Disputed Claim Terms ................................2

        1.  "the scored flexural strength being the flexural strength of the laminated structure after the outer, paper-clad surface of one of the first and second gypsum boards has been scored ......................................3

        2.  "a scored flexural strength of the laminated structure is about 22 pounds per ½ inch thickness of the structure" ...........................................9

        3.  "inner surface" ................................................................................17

        4.  "outer, paper-clad surface" .............................................................21

    B.  U.S. Patent No. 8,181,738 Disputed Claim Terms ..............................22

        1.  "external surface" ............................................................................22

        2.  "internal surface" ............................................................................24

IV.  CONCLUSION ...............................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Eon Corp. IP Holdings v. Silver Spring Networks*
  815 F.3d 1314 (Fed. Cir. 2016) ................................................................................20

*Genentech, Inc. v. Chiron Corp.*
  112 F.3d 495 (Fed. Cir. 1997) ..................................................................................20

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*
  381 F.3d 1111 (Fed. Cir. 2004) ..................................................................................3

*Markman v. Westview Instruments, Inc.*
  52 F.3d 967 (Fed. Cir. 1995) ......................................................................................9

*Mars Inc. v. H.J. Heinz Co.*
  377 F.3d 1369 (Fed. Cir. 2004) ................................................................................20

*Modine Mfg. Co. v. United States Int'l Trade Comm'n*
  75 F.3d 1545 (Fed.Cir.1996) ....................................................................................16

*Nautilus, Inc. v. Biosig Instruments, Inc.*
  134 S. Ct. 2120 (2014) ..............................................................................................14

*Omega Engineering, Inc. v. Raytek Corp.*
  334 F.3d 1314 (Fed.Cir. 2003) ...................................................................................3

*Pall Corp. v. Micron Separations, Inc.*
  66 F.3d 1211 (Fed.Cir.1995) ....................................................................................16

*Renishaw PLC v. Marposs Societa'*
  158 F.3d 1243 (Fed. Cir. 1998) ................................................................................11

*U.S. Surgical Corp. v. Ethicon, Inc.*
  103 F.3d 1554 (Fed. Cir. 1997) .....................................................................22, 23, 25

<u>Other Authorities</u>

U.S. Patent No. 8,181,738 .......................................................................2, 22, 23, 24, 25

U.S. Patent No. 9,388,568 ............................................1, 2, 9, 11, 13, 14, 15, 16, 18, 19, 21

# I.      INTRODUCTION

Plaintiff Pacific Coast Building Products, Inc. ("Pacific Coast") submits this opening claim construction brief regarding the six disputed terms the parties submitted for construction. Defendants CertainTeed Gypsum, Inc. ("CertainTeed") and Saint Gobain Performance Plastics Corp. ("Saint Gobain") (collectively, "Defendants"), after being outbid by Pacific Coast to buy this patent portfolio from the prior owners and now faced with a clear case of infringement, offer constructions that impermissibly ignore the teachings in the specification, the claim language itself, their own expert's opinion and testimony, and their own documents relating to the terms at issue.

# II.     OVERVIEW OF THE TECHNOLOGY

## A.      U.S. Patent No. 9,388,568

U.S. Patent No. 9,388,568 ("the '568 patent") is entitled "Acoustical Sound Proofing Material with Improved Fracture Characteristics and Methods for Manufacturing Same" and issued on July 12, 2016.  (Gafford Decl. Ex. 2, the '568 patent).  The '568 patent discloses a laminated sound-attenuating panel comprised of two layers of gypsum board that are joined by a layer of viscoelastic glue.  Laminated sound-attenuating panels had been around for at least twenty years before the 2007 filing date of the '568 patent.  One problem with these prior art laminated panels that the invention in the '568 patent solved was that these laminated panels could not be cut to size like traditional drywall (non-laminated gypsum boards) panels because of the internal paper-faced surfaces.  Traditional drywall, which is comprised of a layer gypsum covered with a face paper and back paper, is cut to size using the score and snap method. (Gafford Decl. Ex. 3, "Cutting Drywall" magazine article, PA-000397–402).   The score and snap method involves the installer scoring through the face paper using a utility knife, snapping the panel along the score line, and then cutting through the back paper.  These prior art laminated sound-attenuating panels could not be scored and snapped in the traditional method because of the additional internal paper-faced surfaces.  (Gafford Decl. Ex. 2, '568 patent, Col. 1, l. 67 – Col. 2, l. 24).  The '568 patent discloses laminated panels that do not have these

1  additional internal paper-faced surfaces, which allow the panels of the invention to be cut with

2  the traditional score and snap method.  (*Id.* at Col. 7, ll. 46–51).

3  **B.**  **U.S. Patent No. 8,181,738**

4  U.S. Patent No. 8,181,738 ("the '738 patent") is entitled "Acoustical Sound Proofing

5  Material with Improved Damping at Select Frequencies and Methods for Manufacturing Same"

6  and issued on May 22, 2012.  (Gafford Decl. Ex. 1, the '738 patent).  The '738 patent discloses a

7  laminated panel with two layers of material that are joined by a layer of viscoelastic glue.  The

8  main import of the '738 patent is that by altering the material components and characteristics of

9  the viscoelastic glue to cause the viscoelastic glue to have a selected shear modulus, the

10  laminated panel achieves maximum sound dampening at a specific target frequency or across a

11  range of targeted frequencies.  (*Id.* at Col. 2, ll. 33–40).

12  **III.**  **ARGUMENT**

13  **A.**  **U.S. Patent No. 9,388,568 Disputed Claim Terms**

14  The only asserted claim from the '568 patent is claim 21, which provides:

15  21. A laminated, sound-attenuating structure which comprises:

16  a first gypsum board having two surfaces, the first of said two surfaces
17  comprising an **outer, paper-clad surface** and the second of said two surfaces
   comprising an **inner surface**, wherein the entire **inner surface** of the first
18  gypsum board is unclad;

19  a layer of viscoelastic glue on the second of said two surfaces; and

20  a second gypsum board over said viscoelastic glue, said second gypsum
   board having two surfaces, the first of said two surfaces of said second gypsum
21  board comprising an **outer, paper-clad surface** and the second of said two
   surfaces of said second gypsum board comprising an **inner surface**, wherein the
22  entire **inner surface** of the second gypsum board is unclad;

23  **a scored flexural strength of the laminated structure is about 22
24  pounds per 1/2 inch thickness of the structure**;

25  **the scored flexural strength being the flexural strength of the
   laminated structure after the outer, paper-clad surface of one of the first and
26  second gypsum boards has been scored.**

27  (Gafford Decl. Ex. 2, '568 patent, Col. 10, ll. 13–34) (disputed terms emphasized).

28

1.     **"the scored flexural strength being the flexural strength of the laminated structure after the outer, paper-clad surface of one of the first and second gypsum boards has been scored**

| Claim Term | Pacific Coast's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| the scored flexural strength being the flexural strength of the laminated structure after the outer, paper-clad surface of one of the first and second gypsum boards has been scored (claim 21) | Plain and ordinary meaning | Indefinite |

This limitation of claim 21 defines the term "scored flexural strength," and it should be construed to have its plain and ordinary meaning.  *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004) (claim construction begins with and "remain[s] centered on the claim language itself."); *Omega Engineering, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed.Cir. 2003) (there is a heavy presumption that the language of the claims must be interpreted according to its ordinary meaning).  The claim language is unambiguous—the scored flexural strength is the "flexural strength of the laminated structure [panel] after [one of] the outer, paper-clad surface[s] [of the] gypsum boards has been scored." There should be no dispute here.

**The specification supports the plain and ordinary meaning.** It is undisputed that a person of ordinary skill in the art would have understood the meaning of the term "scored" and "flexural strength."  (*See infra* at pp. 5–9 (both parties' experts opining that these are known terms of art)).  Such person need not look past the '568 specification to understand the meaning of this claim term.  First, the specification defines what a panel's flexural strength is and how it is measured by providing:

> A second figure of merit for the physical characteristics of construction panels is the material's flexural strength. This refers to the ***panel's ability to resist breaking when a force is applied to the center of a simply supported panel***. Values of flexural strength are given in pounds of force (lbf) or Newtons (N). The measurement technique used to establish the flexural strength of gypsum wallboard or similar construction panels is ASTM C 473-06a "Standard Test

Methods for the Physical Testing of Gypsum Panel Products" (publication date Nov. 1, 2006).

(Gafford Decl. Ex. 2, '568 patent, Col. 2, ll. 45–54).  *Second*, the specification explains that a panel's flexural strength changes when the outer paper-faced surface is scored:

> The desired flexural strength of a panel is dependent upon the situation. For a pristine panel, a high flexural strength is desirable since it allows for easy transportation and handling without panel breakage. However, ***when the panel is scored by the tradesman (for example, with a utility knife) for fitting and installation, a low flexural strength is desirable***. In that case, a low value indicates that the ***scored panel may be easily fractured by hand without excessive force.***

(*Id.* at Col. 2, ll. 55–62).

*Third*, the specification provides further explanation regarding the scored flexural strength of the present invention:

> In comparison**, *scored*** typical prior art gypsum sheets (F1 to F4 and E1 to E4) with interior paper faced surfaces, have an average ***flexural strength*** of 15 pounds force for 1/2 inch thick and 46 pounds force for 5/8 inch thick respectively. These prior art laminated panels ***can be scored and fractured in the standard manner*** used in construction but lack the acoustic properties of the structures described herein. The other prior art structures shown in FIG. 4 (A1-A4 to D1-D4 and G1-G4) have an average peak load at fracture above fifty pounds force and thus are unacceptable materials for traditional fracture methods during installation. Of these prior art materials, QuietRock.RTM. (G1-G4) has improved sound attenuation properties but cannot be scored and fractured using traditional scoring and breaking methods. The present invention (represented by H1 to H4) has a ***scored flexural strength of 22 pounds force*** as shown in FIGS. 3 and 4 and thus can be scored and fractured in the standard manner used in construction while at the same time providing an enhanced acoustical attenuation of sound compared to the prior art structures

(*Id.* at Col. 6, l. 53 – Col. 7, l. 4).  Notably, the reference to "*the standard manner*" of "*scor[ing] and fractur[ing]*" (above) in the specification demonstrates that these were well-known industry terms and the claim limitation should be construed using its plain and ordinary meaning.

Lastly, the specification provides that because of the lower scored flexural strength "the laminated structures of this invention … provid[e] for traditional scoring and hand fracture during installation."  (*Id.* at Col. 7, ll. 46–51).

It is clear from the specification that the "scored flexural strength" of a panel is simply the flexural strength after being scored through the outer, paper-faced surface, as indicated in the claim language.

**Both parties' extrinsic evidence supports the plain and ordinary meaning of this term.** The extrinsic evidence cited by both parties shows that "scored," as used in connection with drywall, means cutting through the outer, paper-faced surface of one side of the panel—that is the plain language of claim 21.  For example, Defendants produced prior art magazine articles and construction books that support the plain meaning of "score"—cutting through the outer paper:

- "Make straight-line cuts across full width or length of board by scoring the face paper."  (Gafford Decl. Ex. 4, The Gypsum Construction Handbook, at 106–107, PA-000395–96).

- "Score the face paper of the gypsum board completely to the core."  (Gafford Decl. Ex. 5, "Drywall Construction Handbook," at PA-000384);

- "One pass with a sharp knife is enough to cut through the drywall's paper face." (Gafford Decl. Ex. 3, ""Cutting Drywall," Ex. 5 from Miller depo, at PA-000398);

- "Use a utility knife to score the facing paper along the cutting line you have marked."  (Gafford Decl. Ex. 6, "Drywall Contracting," at PA-000433).

Plaintiff produced third-party instructional videos that support the plain meaning of "scored":

- "You're not trying to cut through the drywall, you're just trying to cut through the paper.  Not a whole lot of pressure …Just try to cut through the paper because that's all that's needed."  (Gafford Decl. Ex. 7, Youtube video entitled, "How to Cut and Hang Drywall – Beginners Guaranteed Great Results," PC004609);

- "Remember, you're just cutting the paper."  (Gafford Decl. Ex. 8, Youtube video entitled, "Complete Drywall Installation Guide Part 3 Measuring and Cutting Techniques," PC004607).

**Plaintiff's expert opined that "scored flexural strength" was a known term of art.** Pacific Coast's expert, Matthew Risinger, is a custom homebuilder and remodeler with over twenty three years of experience in the construction industry.  His opinion confirms that one of ordinary skill in the art in 2007 would know what "scored flexural strength" means in the context of claim 21.  Specifically, he opined that "one of ordinary skill in the art knew in 2007

that scoring drywall in order to use the score-and-snap method of cutting drywall for installation means to cut through the outer paper, and this cutting of the outer paper provides the functionality that is the essence of the invention."  (Gafford Decl. Ex. 10, 8/17/08 Risinger Decl. ¶ 13).  He further opined that "one of ordinary skill in the art knows that scoring deeper into the gypsum panel in order to use the score-and-snap method of installation is not needed and that minor variances in the depth of the score into the gypsum panel do not materially affect the strength needed to snap the panel."  (*Id.* at ¶ 14).

**Defendants' expert agreed that "flexural strength" is a definite term.** CertainTeed's expert testified that the term "flexural strength" is "a well-defined term" and that he understands what the '568 patent means by that term.  (Gafford Decl. Ex. 11, Miller Depo. Tr. 78:4–7).

**Defendants' expert agreed that "scored" is definite.** Dr. Miller testified the plain meaning of "scoring" is "cutting the paper." His testimony comports with the plain language of claim 21.  Specifically, he testified:

> Q Would you agree that a contractor that installs drywall would know what is meant by the term "score and snap"?
>
> A Yes, I think that would be a common term among contractors.
>
> Q Do you think he would know what is meant by just the term "score?"
>
> MR. MOORE: Objection. Vague. And to the extent it calls for a legal conclusion.[1]
>
> A He might have an opinion of what's called "score," though I believe a more accurate definition of that would be actually *just a cut in the paper* to be considered a score.

(*Id.* at 102:5–17).

> Q Right. And the "scoring" section is scoring the face paper. That's all I'm asking.
>
> MR. MOORE: Objection. Vague to the extent you're calling for a legal conclusion, and asked and answered.
>
> A It would be scoring the paper on one side.

---

[1] Mr. Moore's objections throughout the deposition to questions seeking Dr. Miller's analysis are not redacted from the transcript excerpts cited herein..

1    (*Id.* at 136:12–17).

2        Q I mean, the book you cited says "score" for the face paper, and then for the
         back paper, it says "cut."

3

4        A Oh. I think, as we talked about earlier, that -- when you were asking for the
         definition of "scoring," that one might refer to actually just cutting the paper. I
         believe that was my answer.

5

6        Q *So "scoring" means cutting the paper?*

7        A *Yes.*

8    (*Id.* at 139:16–24).

9        While Defendants may argue that "cutting the paper" does not necessarily mean cutting

10   through it, arguing that a cut ("score") is merely a portion of paper's thickness results in an

11   outcome that is virtually impossible to duplicate (cutting a mere groove through paper that is a

12   fraction of a millimeter thick) in practice and contradicts Dr. Miller's testimony that score is a

13   common term in the industry.  As such, Dr. Miller's **conclusory opinions contradict his**

14   **testimony and ignore the intrinsic evidence (plain language of the claim) and should be**

15   **disregarded.**  Dr. Miller at one point testified that "scored" and "flexural strength" are common

16   terms in the industry, but then changed his testimony, offering a different definition for "scored"

17   ("cutting a groove with a sharp instrument") (*Id.* at 181:8–14), to reach his final conclusion that

18   the term is indefinite because the patent "doesn't give instructions with reasonable certainty

19   what it actually means in terms of 'scored'" (*Id.* at 76:4–13.) That is nonsense.  Dr. Miller

20   ignored the plain language of the claim and his own understanding of the term "scoring." His

21   testimony should be disregarded:

22       Q Do you believe that limitation, the one starting with, "The scored flexural
         strength" provides a definition of "scored flexural strength?"

23

24       A No, I think it takes more detail to understand what "scored" means. Scoring
         refers to cutting a groove with a sharp instrument. Scoring will vary from installer

25       to installer, even from product to product for an individual installer. So there's a
         lot more to understand "scored flexural strength" than the general description

26       given there of "scored," since we say it could be as basic as just cutting a groove
         with a sharp instrument.

27       Q Right. And the documents we looked at earlier, these excerpts from the books,

28       they all said "scored" meant cutting through the paper; is that correct?

1    MR. MOORE: Objection. Mischaracterizes the testimony.

2    A Some of the documents we have looked at today does say that, but "scoring"
     refers to cutting a groove with a sharp instrument.  There are a variety of things
3    that may affect scoring.

4    Q But the plain language of the claim says scoring through the outer paper-clad
     surface; is that true?

5    MR. MOORE: Objection. Misreads the claim. Are you suggesting you're reading
     that?
6

7    MR. GAFFORD: No, I'm asking him.

     A Could you repeat --
8
     MR. MOORE: You're saying the claim reads something and then it doesn't say it.

9    A Could you repeat your question, please?

10   Q Yeah. Doesn't the claim define "scored" as meaning once the outer paper-clad
     surface has been cut?
11
     MR. MOORE: Objection. Mischaracterizes the testimony, mischaracterizes the
12   claim.

13   A What the claim says is, "The scored flexural strength being the flexural strength
     of the laminated surface after the outer paper-clad surface of one of the first and
14   second gypsum boards has been scored."  As we[2] mention in paragraph 55, there
     are a variety of things that can affect scoring that would change the definition of
15   "scoring." A basic definition of "scoring" would refer to cutting a groove with a
     sharp instrument.
16
     Q But as it's used here in the language of the claim, it means cutting through the
17   outer paper-clad surface --

18   MR. MOORE: Objection.

19   Q -- would you agree with that?

     MR. MOORE: Mischaracterizes the testimony and asked and answered now at
20   least twice.

21   Q Do you not agree with that? Do you disagree with me?

22   MR. MOORE: Objection. Asked and answered. Testimony before speaks for
     itself and already answers this.

23   A Once again, as I mention, there are a variety of things that can affect scoring --

24   Q I under- --

25   A -- that might change the definition of that.

     Q I understand that. I'm asking you about the plain language of the claim.
26
     A Yes.
27
     ―――――――――――――――――――――

28   [2] Dr. Miller uses "we" to refer to his declaration.

Q Does it define "scored" as cutting through the outer paper-clad surface?

MR. MOORE: Objection. Asked and answered.

A Line 55 of the patent says, about 22 pounds per half-inch thickness of the structure. Scored flexural strength being the flexural strength of the laminated structure after the outer clad surface of one of the first and second gypsum boards has been scored. It doesn't specify what it means by "scored."

Q And you're again reading from the wrong claim. It – we're in claim 21, not claim 23. But --

A Wasn't the last question from claim 21? When I read from claim 23, you said that was the wrong one.

Q You just read from claim 23 again.

MR. MOORE: I'm not sure that's correct.

A Let's read that again. Would you repeat your question?

Q I said, do you disagree the claim language of claim 21 in the last limitation defines "scoring" as being cutting through the outer paper-clad surface?

MR. MOORE: Objection. Asked and answered multiple times.

A As we've mentioned before, that "scoring" refers to cutting a groove with a sharp instrument. I don't believe that that is defined in the patent in terms of what "scored" means in reference to "scored flexural strength."

(*Id.* at 181:8–185:1).

As this testimony shows, Dr. Miller refused to even acknowledge the plain language of the claim, and instead insisted on offering his unsupported and inconsistent opinion that the claim is indefinite.  Dr. Miller's testimony should be disregarded. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 981 (Fed. Cir. 1995) (Extrinsic evidence is generally less useful or reliable, and it should not be relied on when it contradicts the intrinsic evidence).

        **2.**    **"a scored flexural strength of the laminated structure is about 22 pounds per ½ inch thickness of the structure"**

| Claim Term | Pacific Coast's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| a scored flexural strength of the laminated structure is about 22 pounds per ½ inch thickness of the structure (claim 21) | The flexural strength of the laminated panel after the outer, paper-clad surface of one of the first and second gypsum boards has been scored is about 22 pounds per ½" thickness | Indefinite |

The meaning of this "scored flexural strength" claim limitation from claim 21 of the '568 patent, when read in conjunction with the "scored flexural strength" limitation discussed above and the specification, has a clear, unambiguous meaning.  Pacific Coast's proposed construction takes the plain and ordinary meaning of "scored flexural strength" from claim 21 and places it into this claim limitation.  In other words, Pacific Coast's proposed construction is the plain and ordinary meaning when combining the last two limitations of claim 21.

The specification provides a detailed explanation of this limitation that is consistent with Pacific Coast's construction.  *First*, the specification defines the "flexural strength" of "construction panels":

> A second figure of merit for the physical characteristics of construction panels is the material's flexural strength. ***This refers to the panel's ability to resist breaking when a force is applied to the center of a simply supported panel***.

(Gafford Decl. Ex. 2, '568 patent, Col. 2, ll. 45–48; Gafford Decl. Ex. 14, Miller Depo. Ex. 10, ASTM Standard C473-06a, p. 6).  *Second,* the specification explains how "flexural strength" is measured (using an industry standard):

> Values of flexural strength are given in pounds of force (lbf) or Newtons (N). The ***measurement technique*** used to establish the flexural strength of gypsum wallboard or similar construction panels is ASTM C 473-06a "Standard Test Methods for the Physical Testing of Gypsum Panel Products" (publication date Nov. 1, 2006).

(Gafford Decl. Ex. 2, '568 patent, Col. 2, ll. 48–54).  *Third,* the specification explains how to arrive at the specific measurement identified in this limitation: "about 22 pounds per ½ inch thickness of the structure."

> FIG. 3 shows flexural strength test results for an embodiment wherein the interior surfaces (104 and 105) the gypsum sheets 101, 103 do not have an additional facing material such as paper. The sample tested was constructed consistent with FIG. 1, and had dimensions of 0.3 m by 0.41 m (12 inches by 16 inches) and a total thickness of 13 mm (0.5 inch). A three point bending load was applied to the sample according to ASTM test method C 473, bending test method B. ***The measured flexural strength was 22 pounds force.***

(*Id.* at Col. 6, ll. 35–43).  As can be seen from Figure 3 of the '568 patent (shown below), four samples constructed consistent with Figure 1 were tested, and the measured range was 19.8–24.1

pounds with an average scored flexural strength of 22 pounds with a 1.82 standard deviation. The specification provides that "the present invention (represented by H1-H4) has a scored flexural strength of 22 pounds force as shown in FIGS. 3 and 4 and thus can be scored and

| Sample Number | Sample Description | Peak Load at Fracture (lbf) |
|---|---|---|
| H1 | ½ inch thick laminated gyp panel optimized for fracture | 24.1 |
| H2 | ½ inch thick laminated gyp panel optimized for fracture | 21.7 |
| H3 | ½ inch thick laminated gyp panel optimized for fracture | 19.8 |
| H4 | ½ inch thick laminated gyp panel optimized for fracture | 22.4 |
| Average | | 22.0 |
| Standard Deviation | | 1.82 |

**FIG. 3**

fractured in the standard manner used in construction."  (*Id.* at Col. 6, l. 66–Col. 7, l. 2).

Pacific Coast's proposed construction is consistent with the inventors' intention and the Court should adopt it.  *See Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) ("Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim.").

**Defendants' indefiniteness argument contradicts the record and should be rejected.**
The plain language of this claim limitation, when coupled with the subsequent limitation from claim 21 and read in conjunction with the specification, informs one of ordinary skill in the art with reasonable certainty how to test a laminated wallboard to determine its "scored flexural strength."  Specifically, a 12" x 16" sample of the material is cut. The sample is then scored by cutting through the outer, paper-faced surface.  The scored sample is then subjected to a three point bending load as described in ASTM test standard C473.  One skilled in the art knows with reasonable certainty how to do each of these straightforward steps.  In fact, Pacific Coast internally performed these very steps regarding Defendant CertainTeed's accused product and found that it met this limitation (and all the limitations) of claim 21.  (*See* Dkt. No. 1, Complaint, Ex. H).

1    CertainTeed, which previously offered to pay a substantial sum for this patent (but was

2 outbid by Plaintiff), now argues that the "scored flexural strength" claim limitation is indefinite.

3 The crux of its indefiniteness argument is that the depth of the score is not disclosed by the

4 patent and the patent specification does not explain how the ASTM C473 test standard for

5 flexural strength was followed.  All of Defendants' disingenuous arguments regarding

6 indefiniteness fail.

7    *First*, Defendants' expert ignores the plain language of the claim and opines that "a

8 person of ordinary skill in the art would not know how deep to score a specimen." ((Gafford

9 Decl. Ex. 9, 8/17/18 Decl. of Miller at ¶ 125).  That is demonstrably false. The plain language of

10 the claim tells one of ordinary skill in the art how deep to score the laminated panel—through

11 the outer, paper-clad surface.  The specification states that "the present invention . . . can be

12 scored and fractured in the ***standard manner*** used in construction."  (Gafford Decl. Ex. 2, '568

13 patent at Col. 6, l. 66 – Col. 7, l. 2).  As discussed above, the extrinsic evidence cited by both

14 parties demonstrates that "scored," as used in connection with drywall, means cutting ***through***

15 ***the outer***, paper-faced surface one side of the panel, and both experts agree that score (through

16 the paper) and snap (fracture) is the standard manner used in the construction industry to install

17 drywall.

18    Scoring through the paper is the standard manner, and the construction industry knows

19 that any deeper is unnecessary.  Pacific Coast's expert opined: "one of ordinary skill in the art

20 knows that scoring deeper into the gypsum panel in order to use the score-and-snap method of

21 installation is not needed and that minor variances in the depth of the score into the gypsum

22 panel do not materially affect the strength needed to snap the panel."  (Gafford Decl. Ex. 10,

23 8/17/08 Risinger Decl. ¶ 14).

24

25

26

27

28

1      *Second*, Defendants' expert's own "scored flexural strength" tests and results are

2   consistent with the claim limitation and demonstrate that such limitation is not indefinite.  Dr.

3   Miller performed his own "scored flexural strength" testing of Pacific Coast's product that

4   Pacific Coast contends is covered by the '568 patent.[3]  To perform his tests, he tested the panels'

5   unscored flexural strength and the panels' scored flexural strength at five different score depths.

6   (Gafford Decl. Ex. 9, Miller Decl. ¶ 92).  For each score depth, he tested the panel in four

7   different orientations, as discussed below.  (*Id.* at ¶ 21).  Counter to the teaching of the

8   specification which calls for an average value, he presented his findings as twelve individual

9   values for each score depth (e.g. Figure 3 of the '568 patent *supra*).  The table below shows the

10  average scored flexural strength values

11  measured by Dr. Miller in his testing for each

12  score depth.[4]  The horizontal line is the 22

13  pounds value from claim 21.  As shown in the

14  chart, there is a large difference in the unscored

15  panels' flexural strength (score depth 0) and the

16  scored panels' flexural strength regardless of

17  depth, which coincides with the teachings of the



Dr. Miller's Average Flexural Strength

18  '568 patent and the purpose behind the invention.  Further, and as Pacific Coast's expert opined:

19  the "variances in the depth of the score into the gypsum panel do not materially affect the

20  strength needed to snap the panel."  (Gafford Decl. Ex. 10, 8/17/08 Risinger Decl. ¶ 14).  In fact,

21  the average scored flexural strength values from Dr. Miller's own testing for a score depth of 2.5

22  mm is lower (20.7 pounds) than for a score depth of 3.5 mm (21.0 pounds).

23      Dr. Miller's own testing shows definitively that the "scored flexural strength" testing

24  limitation is not indefinite.  The average scored flexural strength value of all scored samples he

25  _____

26  [3] Dr. Miller did not test or study CertainTeed's accused product.  (Gafford Decl. Ex. 11, Miller Depo. Tr. 52:25–53:3, 167:11-13)

27  [4] The values shown are the values converted to ½" thickness per linear extrapolation.  The average value reported for a score depth of 0.5mm does not include the 83 lbf value measured for the parallel face up sample due to it likely being "not up to the specifications of the rest of the batch."  (Gafford Decl. Ex. 11, Miller Depo. Tr. 271:5–

28  272:2.).  Test results depicted in table with vertical axis representing pounds of force, and horizontal axis representing score depth.

tested—regardless of score depth, orientation of sample (face up/face down;

parallel/perpendicular), and even including the obvious outlier—is 23.5 pounds.  With the

obvious outlier excluded, the average scored flexural strength value is 22.9 pounds.  Both of

these values are consistent with the "about 22 pounds" portion of the claim limitation at issue.

Dr. Miller, one who purports to be of ordinary skill in the art, performed a test that when the data

is treated as it was in the specification of the '568 patent (an average of all tested values), exactly

replicates the value reported in the claim language.  This claim limitation is not indefinite.  *See*

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014) (a claim is not indefinite if it

informs, with reasonable certainty, those skilled in the art about the scope of the invention).  Dr.

Miller's test proves with, not just reasonable certainty, but rather exact certainty, that one of skill in

the art has full possession of the scope of the invention.

     *Third,* Dr. Miller's opinions about the parallel vs. perpendicular orientations of the

specimen do not apply here.  Dr. Miller opines that whether the specimen is tested in a parallel

or perpendicular orientation has an effect on its scored flexural strength and that this difference

is caused by the direction of the fibers in the outer paper of the boards.  (Gafford Decl. Ex. 9,

Miller Decl. ¶¶ 21, 61–63).  His deposition testimony confirmed this belief:

> Q Okay. So when you say "paper fibers," are you referring to paper fibers within the gypsum panel?
>
> A No, I'm referring to paper fiber that is actually used on the surface.
>
> Q On the face paper and the backing paper?
>
> A Yes, sir.
>
> Q And those paper fibers and the orientation of them is what causes the difference between the perpendicular and parallel flexural strength measurements?
>
> A That's what causes a difference, yes.

(Gafford Decl. Ex. 11, Miller Depo. Tr. 223:2–12).  But that cannot be true for scored flexural

strength testing because those paper fibers on the surface are cut (scored) before testing such that

their orientation no longer plays a role in the board's scored flexural strength.

*Fourth*, Dr. Miller opines that it is not appropriate in the gypsum industry to convert between thicknesses of products and that there is no industry standard for converting flexural strength measurements between 5/8" thick product and ½" thick product.  (Gafford Decl. Ex. 9, Miller Decl. ¶ 22).  He further believes it is improper to convert between thicknesses using linear extrapolation.  (*Id.*).  He is wrong and his opinion is directly contrary to industry standards.  In his declaration he included this table from an ASTM standard regarding the minimum flexural strength for gypsum boards of various thicknesses.  (Gafford Decl. Ex. 12, Miller Depo. Ex. 8, ASTM Standard C1396/C1396-06a).  When asked about the relationship between the thickness and the flexural strength values in the last two columns that correlate with "Method B,"[5] he opined that "they would typically be non-linear" and "would be a curve instead of being a straight line."  (Gafford Decl. Ex. 11, Miller Depo. Tr. 231:7–16).  That is wrong.  A simple graph of the values from the



ASTM standard shows that they do in fact have a linear relationship.  This linear relationship is further supported by the newly revised 2017 version of this ASTM standard which specifically allows for "interpolat[ing] between the two adjacent thicknesses in the tables."  (Gafford Decl. Ex. 13, Miller Depo. Ex. 9, ASTM Standard C1396/C1396-17, Sec. 4.6.6.1).  As set forth above, linear extrapolation between the 5/8" thick panels tested by Dr. Miller to 1/2" thickness per claim 21 resulted in an average scored flexural strength of 22.9 pounds.

*Finally*, the use of the word "about" does not render the term indefinite.  The parties disagree on the numerical scope of the "about 22 pounds" portion of the disputed limitation.  The word "about" does not have a

---

[5] Method B was the testing procedure referenced in the '568 patent.

universal meaning in patent claims, and the meaning depends upon the technological facts of the particular case.  *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1217 (Fed.Cir.1995). Further, the use of the word "about," avoids a strict numerical boundary to the specified parameter, and its range must be interpreted in its technological context and how it is used in the patent's specification.  *Id.*  The specification of the '568 patent sets forth an upper limit of 50 pounds for a prior art panel's scored flexural strength in order for the panel to be scored and snapped in the traditional sense.  Specifically, the specification provides:

> In comparison, scored typical prior art gypsum sheets (F1 to F4 and E1 to E4) with interior paper faced surfaces, have an average flexural strength of 15 pounds force for 1/2 inch thick and *46 pounds force for 5/8 inch thick respectively. These prior art laminated panels <u>can be</u> scored and fractured in the standard manner* used in construction but lack the acoustic properties of the structures described herein. The other prior art structures shown in FIG. 4 (A1-A4 to D1-D4 and G1-G4) have an average peak load at fracture *above fifty pounds* force and thus are <u>*unacceptable*</u> *materials for traditional fracture methods* during installation. (emphasis added)

(Gafford Decl. Ex. 2, '568 patent at Col. 6, ll. 53–63).  The inventor's stated meaning here is that any scored flexural strength of less than 50 pounds is able to be scored and snapped in the traditional manner.  As discussed above, the invention disclosed in the '568 patent is a laminated sound-attenuating panel that can be scored and snapped in the traditional manner.  (*Id.* at Col. 7, ll. 46–51).  When construing the term "about" it is "appropriate to consider the effects of varying that parameter, for the inventor's intended meaning is relevant."  *Pall*, 66 F.3d at 1217; s*ee also Modine Mfg. Co. v. United States Int'l Trade Comm'n,* 75 F.3d 1545, 1554 (Fed.Cir.1996) (stating that "the usage [of the term 'about'] can usually be understood in light of the technology embodied by the invention.").

Additionally, the ASTM C 473-06a standard (cited in the '568 patent as the industry standard used to test a panel's flexural strength) includes a "Precision and Bias" section that provides reproducibility limits that address variability among single test results.  (Gafford Decl. Ex. 2, '568 patent at Col. 2, ll. 45–54; Gafford Decl. Ex. 14, Miller Depo. Ex. 10, ASTM

Standard C473-06a, p. 6).The four stated reproducibility limits are: ± 8.992 lbf for parallel, face up; ± 7.370 lbf for parallel, face down; ± 13.368 lbf for perpendicular, face up; and ± 19.429 lbf for perpendicular, face down.  (*Id.*).  These are the published industry standards for ranges of acceptable flexural strength measurements.  An average of these four values (as is shown in the '568 patent that averaged the flexural strength values) yields a result of slightly over ± 12 lbf, which would give an approximate range of "about 22 pounds" from claim 21 to mean 10 – 34 pounds.  The high end of this range is still well-below the 50 pound upper limit for scoring and snapping capability set forth in the '568 patent specification.  As a result, the inclusion of the word "about" in the claim limitation is definite by application of the relevant, applicable facts pulled from the very testing standard identified in the patent specification.

### 3.    "inner surface"

| Claim Term | Pacific Coast's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| inner surface (claim 21) | The portion of the face of the gypsum board in the interior of the laminated structure that when clad provides flexural strength | Plain and ordinary meaning |

Claim 21 of the '568 patent uses the term "inner surface" to refer to "the portion of the face of the gypsum board in the interior of the laminated structure that when clad provides flexural strength."  The "plain and ordinary meaning" of "inner surface" cannot be used here where there are multiple components (gypsum boards) with multiple surfaces that make up a single component—the laminated structure.

The intrinsic evidence demonstrates that the "inner surface" here is the side or face of the gypsum boards that are inside the laminated structure (glued together) and sometimes covered with enough paper ("clad"), which provides flexural strength.

**The claim language supports Pacific Coast's construction.**  Claim 21 uses "inner surface" to describe the surfaces of both the first and second gypsum boards that face each other inside of the laminated structure.

Claim 21 of the '568 patent provides in relevant part:

> A laminated, sound-attenuating structure which comprises:
>
> a first gypsum board having two surfaces, the first of said two surfaces comprising an outer, paper-clad surface and the second of said two surfaces comprising an **inner surface**, wherein the entire **inner surface** of the first gypsum board is unclad;
>
> a layer of viscoelastic glue on the second of said two surfaces;
>
> and a second gypsum board over said viscoelastic glue, said second gypsum board having two surfaces, the first of said two surfaces of said second gypsum board comprising an outer, paper-clad surface and the second of said two surfaces of said second gypsum board comprising an **inner surface**, wherein the entire **inner surface** of the second gypsum board is unclad; …

(Gafford Decl., Ex. 2, '568 patent, Cl. 21).  The adjective "inner" is used to describe at least a portion of the inside-facing surface of the gypsum board after the lamination.

**The specification and figures support Pacific Coast's construction.**  The figures and specification of the '568 patent also demonstrate that the "inner surface" as used here is "the portion of the face of the gypsum board . . . that when clad provides flexural strength." the inner surface of the gypsum boards that are glued together.

*First,* the Abstract provides:

> In one embodiment, standard paper-faced wallboard, typically gypsum, comprises the external surfaces of the laminated structure with ***the inner surface of said wallboard*** being bare with no paper or other material being placed thereon. ***The resulting structure*** improves the attenuation of sound transmitted through the structure while also allowing installation of the sound proofing material as efficiently as the installation of standard material.

(*Id.* at Abstract).

1    *Second*, the '568 patent depicts a laminated structure where the surface of a layer of

2    gypsum only becomes an inner surface once laminated to form the final structure that both

3    attenuates sound and scores and snaps like regular gypsum drywall.  The specification explains

4    that prior art laminated sound-attenuating panels cannot be scored and snapped like traditional

5    gypsum wallboard panels "because the component gypsum layers have a liner back paper that

6    has a high tensile strength" and "this internal layer must be broken under tension via

7    considerable bending force during a typical score and snap operation."  (*Id.* at Col. 2, ll. 6–17).

8    The '568 patent solved this problem by disclosing laminated, sound-attenuating structures that

9    have inner surfaces of the gypsum boards without paper.  (*See e.g.*, *Id.* at Col. 3, ll. 12–18).

10   Figure 1 of the '568 patent reproduced below shows one embodiment of the invention.

11      In Figure 1, "the bottom face of gypsum layer 101 is an unfaced (without paper or

12   fiberglass liner) interior surface 104."  (*Id.* at Col. 4, ll. 31–33).  As can be seen, the unfaced

13   (unclad) interior surface 104 of Figure 1 (with only wrap-around paper at the edges) is the "inner

14   surface" of the gypsum

15   boards in the laminated panel

16   that has had the face paper

17   removed to ensure a flexural

18   strength of about 22 pounds,

19   akin to standard drywall.



FIG. 1

20      *Third,* Pacific Coast's proposed construction of "the portion of the face of the gypsum

21   board in the interior of the laminated structure that when clad provides flexural strength" is

22   further supported when the term "inner surface" is read in conjunction with the entirety of claim

23   21.  For example, claim 21 provides in part "a first gypsum board having *two surfaces*, the first

24   of said two surfaces comprising an outer, paper-clad surface and the *second of said two surfaces*

25   *comprising an inner surface*, wherein the entire inner surface of the first gypsum board is

26   unclad."  (*Id.*, cl. 21).  The language of the claim clearly provides that the gypsum board has two

27   surfaces and the second surface *comprises* an inner surface.  The term "comprising," which is

28   synonymous with "including," "containing," or "characterized by," is inclusive or open-ended

1  and does not exclude additional, unrecited elements.  *See, e.g., Mars Inc. v. H.J. Heinz Co.*, 377

2  F.3d 1369, 1376 (Fed. Cir. 2004); *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir.

3  1997) ("Comprising" is a term of art used in claim language which means that the named

4  elements are essential, but other elements may be added and still form a construct within the

5  scope of the claim).

6           The use of the word "comprising" here in claim 21 supports Pacific Coast's proposed

7  construction that the "inner surface" is "the portion of the face of gypsum board … that when

8  clad provides flexural strength."  In other words, "inner surface" is not limited to meaning only

9  the entire second surface of the gypsum board, which is why the plain and ordinary meaning of

10  "inner surface" is not proper.  *See Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d

11  1314, 1319 (Fed. Cir. 2016) (reversing plain and ordinary meaning because "the [district] court

12  did not resolve the parties' dispute by instructing the jury that the claims should be given their

13  plain and ordinary meaning").

14           The table below is instructive in showing the importance of the comprising language and

15  why Pacific Coast's proposed construction is proper.

16

| Actual Claim 21 Language | Claim 21 Language with Comprising Component Removed |
|---|---|
| a first gypsum board having two surfaces, the first of said two surfaces comprising an outer, paper-clad surface and the second of said two surfaces comprising an inner surface, wherein the entire inner surface of the first gypsum board is unclad | a first gypsum board having an outer, paper-clad surface and an inner surface, wherein the entire inner surface of the first gypsum board is unclad |

21  The language of the actual claim defines two surfaces that each comprise at least one surface:

22  one comprises an outer, paper-clad surface, and one comprises an inner surface.  Using the plain

23  and ordinary meaning of "inner surface" does not make clear that the "inner surface" as set forth

24  in the claim is "the portion of the face of the gypsum board in the interior of the laminated

25  structure that when clad provides flexural strength."

26

27

28

4.      "outer, paper-clad surface"

| Claim Term | Pacific Coast's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| outer, paper-clad surface (claim 21) | The face of the gypsum board on the exterior of the laminated structure | Plain and ordinary meaning |

Claim 21 of the '568 patent uses the term "outer, paper-clad surface" to describe the surface of the gypsum board on the exterior of the laminated structure. The logic for Plaintiff's proposed construction mirrors that of the prior term—as used in the patent, "outer, paper-clad surface" has a different meaning than its plain and ordinary meaning because it refers only to an "outer" surface of the laminated panel as a whole, as opposed to the surfaces of its component parts (gypsum boards). Both surfaces of a gypsum board are outer surfaces until they are laminated, then one surface of each board sandwiched into the structure becomes an outer surface (top and bottom of the laminated sandwich) and one surface of each board becomes an inner surface (next to the glue).

This construction is not only logical, but follows the claim language that describes only the laminated structure, not simply the unlaminated gypsum boards that comprise the outer layers. Claim 21 of the '568 patent provides in relevant part:

A laminated, sound-attenuating structure which comprises:

a first gypsum board having two surfaces, the first of said two surfaces comprising an **outer, paper-clad surface** and the second of said two surfaces comprising an inner surface, wherein the entire inner surface of the first gypsum board is unclad;

a layer of viscoelastic glue on the second of said two surfaces;

and a second gypsum board over said viscoelastic glue, said second gypsum board having two surfaces, the first of said two surfaces of said second gypsum board comprising an **outer, paper-clad surface** and the second of said two surfaces of said second gypsum board comprising an inner surface, wherein the entire inner surface of the second gypsum board is unclad; …

(Gafford Decl., Ex. 2, '568 patent, Cl. 21). "Outer, paper-clad surface" is used to describe the exterior facing surface of each of the first and second gypsum boards after they are combined to make up the lamination.

The Abstract of the '568 patent also demonstrates that "outer" (or external) is used in relation to the laminated structure as a whole, rather than its component parts: "standard paper-faced wallboard, typically gypsum, comprises the *external* surfaces of the *laminated structure*." (*Id.* at Abstract).  The specification provides "a *top layer* 101 is made up of a *paper* or fiberglass-faced gypsum material."  (*Id.* at Col. 4, ll. 17–18).

Pacific Coast's proposal to construe "outer, paper-clad surface" as "the face of the gypsum board on the exterior of the laminated structure" aids the jury in understanding that this term refers to the surface of the material on the outside of the overall laminated panel, and is not to be confused with either of the surfaces of the individual gypsum boards that comprise the laminated panel.  *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (claim construction is appropriate to "clarify and when necessary to explain what the patentee covered by the claims").

**B.      U.S. Patent No. 8,181,738 Disputed Claim Terms**

**1.      "external surface"**

| Claim Term | Pacific Coast's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| external surface (claims 1 and 23) | "The functional surface of the material on the outside of the laminated panel" | Plain and ordinary meaning |

Like the outer and inner surface terms from the '568 patent, in the '738 patent "external surface" is used in claims 1 and 23 of the '738 patent to describe one side or surface of both the first and second layers of material that are combined to form the laminated panel.  As used, "external surface" has a different meaning than its plain and ordinary meaning because it is only an "external surface" of the laminated panel as a whole and the first or second layers of material individually have more than one external surface before lamination.

Claim 1 of the '738 patent provides in relevant part:

A laminated panel comprising:

a first layer of material having an **external surface** and an internal surface;

a second layer of material having an **external surface** and an internal
surface;

a layer of viscoelastic glue in contact with the internal surface of said
first layer of material and with the internal surface of said second layer of
material, thereby to bond together the first layer of material and the second layer
of material …

(Gafford Decl., Ex. 1, '738 patent, Cl. 1).  "External surface" (and "internal surface") is used to

describe the sides of each of the layers of material that make up the lamination.  As can be seen

from Figure 1 of the '738 patent, top layer of

material 101 by itself has an external surface on

the top (not labeled with a specific reference

numeral) and another external surface on the

bottom (labeled with reference numeral 101-1).

Claim 1 uses "external surface" to refer to the



FIG. 1

top surface of the board 101 and "internal surface" to refer to the bottom surface 101-1 of the

board which meets the glue between it and the second board 102 on the bottom.  Claim 1 also

uses "external surface" to refer to the bottom surface of board 102 (which does not meet the top

board) and "internal surface" to refer to the top surface 102-1 of the bottom board, which meets

the glue between it and the top board.  But these uses of both "external surface" and "internal

surface" are not consistent with their plain and ordinary meanings (*i.e.*, external means outside;

internal means inside) until after the top layer 101 and the bottom layer 102 have been laminated

together by the glue 103 to form panel 100.

Pacific Coast's proposal to construe "external surface" to mean "the functional surface of

the material on the outside of the laminated panel" aids the jury in understanding that it is the

surface of the material on the outside of the overall laminated panel rather than either of the

outside surfaces on the individual layers of material used to form the laminated panel.  *See U.S.*

*Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (claim construction is

appropriate to "clarify and when necessary to explain what the patentee covered by the claims").

2.    "internal surface"

| Claim Term | Pacific Coast's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| internal surface (claims 1 and 23) | "The functional surface of the material on the inside of the laminated panel" | Plain and ordinary meaning |

Like the "external surface," "internal surface" is used in claims 1 and 23 of the '738 patent to describe one side or surface of both the first and second layers of material that are combined to make up the laminated panel.  As used, "internal surface" has an opposite meaning than its plain and ordinary meaning because it refers to a surface that is created in the center of the laminated panel by sticking surfaces together that could ordinarily be considered external surfaces. In other words, two surfaces of a gypsum board, which each could be considered outer or external surfaces, are combined (e.g. glued together) to create the "internal surface" of the laminated panel as shown in Figure 1.

Claim 1 of the '738 patent provides in relevant part:

A laminated panel comprising:

a first layer of material having an external surface and an **internal surface**;

a second layer of material having an external surface and an **internal surface**;

a layer of viscoelastic glue in contact with the **internal surface** of said first layer of material and with the **internal surface** of said second layer of material, thereby to bond together the first layer of material and the second layer of material …

(Gafford Decl., Ex. 1, '738 patent, Cl. 1).  "Internal surface" is used to describe the sides of each of the layers of material that make up the lamination.  Claim 1 uses "internal surface" to refer to" the bottom surface 101-1 of board 101 and the top surface 102-1 of board 102, which combine to create the lamianted panel. But this use of "internal surface" is not consistent with its plain and ordinary meaning (*i.e.*, internal means



FIG. 1

inside) until after the top material layer 101 and the bottom material layer 102 have been laminated together by the glue 103 to form panel 100.

Pacific Coast's proposal to construe "internal surface" to mean "the functional surface of the material on the inside of the laminated panel" aids the jury in understanding that this term refers to the surface of the material layer on the ***inside of the overall laminated panel***,  and should not be confused with the individual surfaces of the component material layers when separated.  *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (claim construction is appropriate to "clarify and when necessary to explain what the patentee covered by the claims").

Pacific Coast's proposed construction includes the word "functional" to indicate that the surface in question is the functional inner surface area of the gypsum board layer that adheres to the glue.  The '738 specification provides:

> Care must be taken to ensure that the separation between different glue portions in a patterned layer is less than ½ the wavelength of sound at the maximum frequency that one is looking to attenuate efficiently. For applications involving most common noise sources, this corresponds to separations no greater than 6 inches in the glue pattern. In some embodiments, it may be preferred that the glue layer coverage of bottom surface 101-1 be greater than twenty (20) percent of said surface area.

(Gafford Decl., Ex. 1, '738 patent, Col. 6, ll. 8–18).  In the laminated structure, the glue is not in contact with the entire surface of the board, but only the functional portion of the surface that adheres the board to the glue layer.

## IV.    CONCLUSION

For the foregoing reasons, Pacific Coast respectfully requests that the Court adopt its proposed constructions and reject Defendants' unsupported definitions.

1

2    Dated: September 28, 2018                Respectfully submitted,

3                                            SHEPPARD MULLIN RICHTER & HAMPTON, LLP

4

5                                            By:   */s/ Jason E. Mueller*
                                                   Jason E. Mueller
6

7                                            Attorneys for Plaintiff and Counterdefendant
                                             PACIFIC COAST BUILDING PRODUCTS,
8                                            INC.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28