Jason E. Mueller (*pro hac vice*)
JMueller@SheppardMullin.com
Galyn D. Gafford (*pro hac vice*)
GGafford@SheppardMullin.com
Robert E. Hough, II (*pro hac vice*)
RHough@SheppardMullin.com
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2200 Ross Avenue, 24th Floor
Dallas, TX  75201-6776
Telephone:     (469) 391-7400
Facsimile:     (469) 391-7401

Yasamin Parsafar (State Bar No. 287617)
YParsafar@SheppardMullin.com
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Four Embarcadero Center, 17th Floor
San Francisco, CA  94111-4109
Telephone:     (415) 434-9100
Facsimile:     (415) 434-3947

Attorneys for Plaintiff and Counterdefendant
PACIFIC COAST BUILDING PRODUCTS, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| PACIFIC COAST BUILDING PRODUCTS, INC.,<br><br>                    Plaintiff,<br><br>          v.<br><br>CERTAINTEED GYPSUM, INC. and SAINT GOBAIN PERFORMANCE PLASTICS CORP.,<br><br>                    Defendants.<br><br>AND RELATED COUNTERCLAIMS. | Case No. 5:18-cv-00346<br><br>**PACIFIC COAST BUILDING PRODUCTS, INC.'S REPLY CLAIM CONSTRUCTION BRIEF PURSUANT TO PATENT LOCAL RULE 4-5**<br><br>Hon. Lucy H. Koh<br><br>Hearing Date:   November 29, 2018<br>Hearing time:   1:30 p.m. |

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ............................................................................................................... 1

II.    ARGUMENT ..................................................................................................................... 1

    A.    The "Scored Flexural Strength" Terms Are Not Indefinite ................................... 1

    B.    "Inner Surface" Is A Portion Of The Interior Facing Surface .............................. 12

III.    CONCLUSION ................................................................................................................ 15

## TABLE OF AUTHORITIES

Page(s)

Cases

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*
    67 F.Supp.3d 1100 (N.D. Cal. 2014) ....................................................................................13

*Bicon, Inc. v. The Straumann Co.*
    441 F.3d 945 (Fed. Cir. 2006) ...............................................................................................13

*Dow Chem. Co. v. Nova Chems. Corp.*
    803 F.3d 620 (Fed. Cir. 2015) ............................................................................................5, 6

*Erfindergemeinschaft UroPep GbR v. Eli Lilly and Co.*
    240 F.Supp.3d 605 (E.D. Tex. 2017) ................................................................................8, 12

*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*
    796 F.3d 1312 (Fed. Cir. 2015) ...........................................................................................6, 7

*Genentech, Inc. v. Chiron Corp.*
    112 F.3d 495 (Fed. Cir. 1997) ...............................................................................................13

*Gillete Co. v. Energizer Holdings, Inc.*
    405 F.3d 1367 (Fed. Cir. 2005) .............................................................................................15

*Honeywell Intern., Inc. v. ITC*
    341 F.3d 1332 (Fed. Cir. 2003) ..........................................................................................5, 6

*Koninklijke Philips N.V. v. Zoll Medical Corp.*
    656 Fed.Appx. 504 (Fed. Cir. 2016) .......................................................................................6

*Mars Inc. v. H.J. Heinz Co.*
    377 F.3d 1369 (Fed. Cir. 2004) ........................................................................................13, 15

*Milwaukee Elec. Tool Corp. v. Snap-On Inc.*
    271 F.Supp.3d 990 (E.D. Wis. 2017) ......................................................................................8

*Nautilus, Inc. v. Biosig Instruments, Inc.*
    134 S. Ct. 2120 (2014) ............................................................................................................4

*Ortho-McNeil Pharm. Inc. v. Caraco Pharm. Labs, Ltd.*
    476 F.3d 1321 (Fed. Cir. 2007) .............................................................................................12

*Presidio Components, Inc. v. American Tech. Ceramics Corp.*
    875 F.3d 1369 (Fed. Cir. 2017) ...............................................................................................7

*Regeneron Pharm., Inc. v. Merus N.V.*
    864 F.3d 1343 (Fed. Cir. 2017) .............................................................................................13

*Teva Pharm. USA, Inc. v. Sandoz*
    789 F.3d 1335 (Fed. Cir. 2015) ................................................................................... 5, 6

*In re Wertheim*
    541 F.2d 257 (C.C.P.A. 1976) ....................................................................................... 12

Statutes

35 U.S.C. § 112 ........................................................................................................................ 7

Other Authorities

Patent Local Rule 4-5(c) .......................................................................................................... 1

MPEP, 9th Ed., Rev. 08-2017, § 2111.03 ............................................................................... 13

## I. INTRODUCTION

Defendants' expert's own test shows definitively that the "scored flexural strength" limitations from claim 21 of the '568 patent are definite because the average scored flexural strength of Pacific Coast's covered product he tested was 23.5 pounds, which is consistent with the "about 22 pounds" from the claim. After reading the specification and the cited test standard, Dr. Miller tested 60 samples with five different scored depths (all scored through the paper as claim 21 instructs) and four different orientations (face up/face down and parallel/perpendicular)—the very testing differences that the Defendants argue make the claim limitation indefinite—and his results, when averaged as instructed by the '568 specification, are the same as reported in the claim. Dr. Miller's test proves with, not just reasonable certainty, but rather exact certainty, that one of skill in the art has full possession of the scope of the invention, and therefore the "scored flexural strength" limitations are not indefinite.

Additionally, Defendants' proposed claim construction for a plain and ordinary meaning of the term "inner surface" from claim 21 of the '568 patent ignores black letter patent law regarding the effect of the term "comprising" and seeks to impermissibly alter the scope of the claim to suit Defendants' noninfringement theories. Defendants' arguments regarding the "scored flexural strength" and "inner surface" limitations are rebutted fully below as Plaintiff Pacific Coast Building Products, Inc. ("Pacific Coast") respectfully submits this reply claim construction brief pursuant to Patent Local Rule 4-5(c)[1].

## II. ARGUMENT

### A. The "Scored Flexural Strength" Terms Are Not Indefinite

| Claim Term | Pacific Coast's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| a scored flexural strength of the laminated structure is | The flexural strength of the laminated panel after the outer, paper-clad surface of | Indefinite |

---

[1] Pacific Coast disagrees with several of Defendants' assertions in the '568 patent technology overview section of their brief, including stating that Dr. Miller has 35 years experience in the drywall industry when he admitted in his deposition that he did not begin working with gypsum drywall products until 2006. Pacific Coast will only address those inconsistencies that are necessary for the actual claim construction process.

| Claim Term | Pacific Coast's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| about 22 pounds per ½ inch thickness of the structure (claim 21) | one of the first and second gypsum boards has been scored is about 22 pounds per ½" thickness | |
| the scored flexural strength being the flexural strength of the laminated structure after the outer, paper-clad surface of one of the first and second gypsum boards has been scored (claim 21) | Plain and ordinary meaning | Indefinite |

Faced with a clear case of infringement, as Pacific Coast demonstrated in the claim charts attached to the Complaint (Dkt. No. 1, Ex. H), Defendants now allege that the "scored flexural strength" terms are indefinite because one of ordinary skill in the art would not know with reasonable certainty how to conduct a test to see if an accused product fell within the claim limitations.  However, the plain language of these claim limitations, which is wholly ignored by Defendants, when read in conjunction with the specification, informs one of ordinary skill in the art with reasonable certainty how to test a laminated wallboard to determine its "scored flexural strength."  Specifically, a sample of the material is cut to size, scored by cutting through the outer, paper-faced surface, and then subjected to a three point bending load in accordance with the provided test method from the specification (ASTM test standard C473).  After the samples are tested, the scored flexural strength results obtained are averaged together as shown in Figure 3 of the '568 patent specification.  Applying this exact methodology to Defendants' own testing of Pacific Coast's covered product performed by their expert Dr. Miller shows unequivocally that the claim limitations are definite.

**Defendants Fail To Distinguish "Flexural Strength" And "Scored Flexural Strength"**

Throughout their response, Defendants purposely switch between instances of referencing "flexural strength" and "scored flexural strength" in an effort to confuse the issue, which is otherwise straightforward.  In doing so, Defendants oscillate between over-adherence to

the ASTM standard (while ignoring the claim language and specification) and over-adherence to the specification (while ignoring the test standard). Defendants admit that ASTM test standard C473 discloses how to measure a material's "flexural strength" and not a material's "scored flexural strength." (Dkt. No. 82, pp. 2, 8). But then Defendants assert that the claim limitations regarding "scored flexural strength" are indefinite because the claimed "about 22 pounds" limitation is not in line with how results for "flexural strength" are reported in the test standard. (*Id.* at p. 14). The ASTM test standard was developed for "flexural strength," and Defendants have offered no support as to why "scored flexural strength" values must be reported in the same manner.

First, the act of scoring the sample significantly reduces (or eliminates completely) the differences in the flexural strength values for the various testing orientations contemplated by the test standard. For example, in discussing different testing orientations, Dr. Miller said that the differences in the flexural strength was caused by the direction of the fibers in the outer paper of the boards.[2] (Gafford Ex. 9, ¶¶ 21, 61–63[3]). Once these outer paper fibers on the surface are cut (scored) before testing for "scored flexural strength," their orientation no longer plays a role in the board's scored flexural strength. Defendants argue that "the *flexural strength* results of the four different measurements are meaningfully different." (Dkt. No. 82, p. 13). While true, the "*scored flexural strength*" values are not meaningfully different.

Second, even if the "scored flexural strength" values were different, the specification of the '568 patent reports an average value for the "scored flexural strength" testing, and this average value is what is claimed in asserted claim 21. Figure 3 of the '568 patent shows the average scored flexural strength values for the samples tested in accordance with the methodology set forth in the specification. Dr. Miller chose the score depths to test (five separate depths), chose the orientations to test (four different orientations), and chose the number

---

[2] Dr. Miller also confirmed in his deposition that the paper fiber orientation in the outer papers is what caused the flexural strength differences in the different orientations as discussed in Pacific Coast's Opening Brief. (*See* Gafford Ex. 11, 223:2–12).

[3] All "Gafford Ex. XX" citations refer to the Gafford Declaration submitted in conjunction with Pacific Coast's Opening Brief (Dkt. No. 80).

1  of samples to test (three samples for each of
2  the four orientations for each of the five
3  depths for a total of sixty samples).  As set
4  forth in Pacific Coast's opening brief (and
5  unrebutted in Defendants' response), the
6  average scored flexural strength for these
7  sixty samples was 23.5 pounds, which under
8  even the most narrow definition of "about"

| Sample Number | Sample Description | Peak Load at Fracture (lbf) |
|---|---|---|
| H1 | ½ inch thick laminated gyp panel optimized for fracture | 24.1 |
| H2 | ½ inch thick laminated gyp panel optimized for fracture | 21.7 |
| H3 | ½ inch thick laminated gyp panel optimized for fracture | 19.8 |
| H4 | ½ inch thick laminated gyp panel optimized for fracture | 22.4 |
| Average | | 22.0 |
| Standard Deviation | | 1.82 |

FIG. 3

9  offered by Defendants is "about 22 pounds" from claim 21.  Put another way, when their
10 expert's test results are treated in the manner prescribed in the specification, the results from the
11 patent are replicated exactly.  The "scored flexural strength" terms are not indefinite.  *See*
12 *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014) (a claim is not indefinite if it
13 informs, with reasonable certainty, those skilled in the art about the scope of the invention).  Dr.
14 Miller's test proves with, not just reasonable certainty, but rather exact certainty, that one of skill in
15 the art has full possession of the scope of the invention.

16 **The Method To Determine Scored Flexural Strength Is Definite**

17         The specification of the '568 patent, when read in conjunction with the plain language of
18 claim 21, sets forth the method to test a laminated panel's scored flexural strength with
19 particularity making claim 21 definite.  The specification sets forth specifically how the scored
20 flexural strength is measured by stating:

21         FIG. 3 shows flexural strength test results for an embodiment wherein the interior
           surfaces (104 and 105) the gypsum sheets 101, 103 do not have an additional
22         facing material such as paper. The sample tested was constructed consistent with
           FIG. 1, and had dimensions of 0.3 m by 0.41 m (12 inches by 16 inches) and a
23         total thickness of 13 mm (0.5 inch). A three point bending load was applied to the
           sample according to ASTM test method C 473, bending test method B. The
24         measured flexural strength was 22 pounds force.
25

26 (Gafford Ex. 2, at Col. 6, ll. 35-43).  This description of the testing procedure when coupled with
27 the claim language explaining that the scored flexural strength is "the flexural strength of the
28 laminated structure after the outer, paper-clad surface of one of the first and second gypsum

boards has been scored" informs one of ordinary skill in art with reasonable certainty how to test a laminated panel's scored flexural strength. Thus, claim 21 is definite.

Defendants attempt to manufacture indefiniteness by focusing on the purported lack of details in the particular testing parameters (*e.g.*, score depth, orientation, etc.), but there is no dispute as to the methodology to use to perform the scored flexural strength test. As discussed above, Defendants' expert followed the methodology set forth in the patent by cutting 12" x 16" samples, scoring the samples through the outer paper, and then subjecting the samples to a three point bending test pursuant to ASTM test method C 473. And again, when his results are averaged together as taught by the patent specification, his measured scored flexural strength matches precisely the claim language of "about 22 pounds." This is not a case where there are multiple methodologies to measured scored flexural strength that yield different results and the patent is silent as to the appropriate one to use. The patent clearly provides the methodology to use, and their expert, a purported person of ordinary skill in the art, followed the prescribed methodology and obtained the same results defined in the patent claim.

The three cases cited by Defendants regarding testing methodologies are inapposite because they each involve several known methodologies, with the patents being silent as to which methodology to use. In *Teva*, the patent was silent as to which of the three common methodologies to measure the average molecular weight of a polymer sample was to be used, even though each measure is "calculated in a different way and would typically yield a different result." *Teva Pharm. USA, Inc. v. Sandoz*, 789 F.3d 1335, 1341 (Fed. Cir. 2015). In *Dow*, the particular value of the slope of strain hardening coefficient had three different accepted values value depending on which method was used to calculate it, and the patent was silent as to which method to use. *Dow Chem. Co. v. Nova Chems. Corp.*, 803 F.3d 620, 633-34 (Fed. Cir. 2015). In *Honeywell*, four sample preparation methods were known to test for melting point elevation with the results depending on which method was chosen, and the patent was silent as to which method to use. *Honeywell Intern., Inc. v. ITC*, 341 F.3d 1332, 1340 (Fed. Cir. 2003). In each of these cases, the claims were found to be indefinite because it was unclear from the patent what standard was to be used to determine infringement. That is not an issue here, as the

methodology to measure the scored flexural strength is set forth with reasonable certainty in the patent specification.

**Defendants' Focus On Particular Testing Parameters Is Misplaced**

Defendants' response is focused, not on the testing methodology disclosed in the patent and actually followed by their expert, but rather on particular testing parameters, which they allege are undefined. However, these testing parameters—score depth, orientation, and conversion between thicknesses—are defined in the patent and/or known by one of skill in the art, which provides reasonable certainty to the bounds of claim 21. Several recent Federal Circuit cases decided after the three cases cited by Defendants (*Teva*, *Dow*, *Honeywell*) have involved similar facts as the present case regarding testing parameters and found the claims to not be indefinite based on those parameters.

For example, in *Koninklijke*, the claim at issue was directed to electrodes for use in a defibrillator, and the patent provided a method of measuring the resistance across two electrodes and electrolytic gel. *Koninklijke Philips N.V. v. Zoll Medical Corp.*, 656 Fed.Appx. 504, 525-26 (Fed. Cir. 2016). The defendant argued that the claim was indefinite, even though it set forth the testing methodology, because certain testing parameters were not defined. *Id.* Specifically, the defendant argued that the claims were not sufficiently clear because the patent was silent regarding details such as "what temperature the procedure should be performed at, how old the electrodes should be, or how many previous electric shocks should have been applied with the electrodes." *Id.* The defendant also presented expert testimony "showing a significant degree of variance in measured resistance as each of these factors changed." *Id.* The Federal Circuit found that although the "lack of precise bounds on these three parameters may mean that the claims do not specify their scope with absolute precision," the defendant did not show by clear and convincing evidence that they did not specify their bounds with reasonable certainty. *Id.* Here, even if the testing parameters objected to be Defendants do cause some variance in the results, that alone is insufficient to render the claims indefinite.

In *Ethicon*, the claims at issue covered surgical shears for cutting and sealing blood vessels that required a clamping pressure within a specified range. *Ethicon Endo-Surgery, Inc.*

*v. Covidien, Inc.*, 796 F.3d 1312, 1316 (Fed. Cir. 2015).  While the specification did provide guidance about the method to measure the clamping pressure, there was no industry standard measurement method and the details of the method to use were not disclosed in the specification. *Id.* at 1317-19.  The Federal Circuit found the specification disclosed that the claimed pressures were average pressures and that "while the actual tested claim force measurements may have varied … due to natural variances in real-world testing conditions," the average measurements were similar.  *Id.* at 1320.  Lastly, the court found that "the definiteness requirement of 35 U.S.C. § 112 mandates only that one skilled in the art must be able to understand *which* pressures are relevant to the claims and *how* those pressures can be measured, so to discern the scope of the claimed average pressure range with reasonable certainty. *Id.* at 1319 (*emphasis in original*).  Here, and as discussed above, Dr. Miller's test showed that the *average* measurements he took were in line with the *average* claimed in the patent.

In *Presidio*, the claim involved a method of measuring capacitance called insertion loss testing.  *Presidio Components, Inc. v. American Tech. Ceramics Corp.*, 875 F.3d 1369, 1375-76 (Fed. Cir. 2017).  The insertion loss testing method was well-established to measure overall capacitor performance, but it was not well known as a method to measure the comparative contributions from different capacitances in a multilayer capacitor.  *Id.*  Further, the patent specification did not "describe how to apply the insertion loss method to determine the portion of the overall capacitance that is attributable to the fringe-effect capacitance." *Id.*  The court found that because the underlying test was well-known and the general modifications to the test were also well known to someone skilled in the art, the claim was not indefinite.  *Id.* at 1376-77. The court also noted:

> To be sure, even where the claims require a particular test result, there may be (and often are) disputes between the parties as to the proper application of the test methodology in the circumstances of an individual case.  But those disputes are disputes about whether there is infringement, not disputes about whether the patent claims are indefinite.

*Id.* at 1377.  Here, the ASTM test standard for flexural strength is known in the art as is the general modification to the test of scoring and snapping drywall as admitted in Defendants'

1 response on p. 9.  Further, Defendants' dispute is one regarding the proper application of the test
2 methodology, which is an infringement dispute, not an indefinite dispute.
3       Several district courts have also followed this same reasoning regarding the
4 particularities of testing parameters.  *See Milwaukee Elec. Tool Corp. v. Snap-On Inc.*, 271
5 F.Supp.3d 990, 1012-1013 (E.D. Wis. 2017) (finding a claim directed to "battery cells being
6 capable of producing an average discharge current greater than or equal to approximately 20
7 amps" not indefinite even though testing parameters such as "how long the battery is used, the
8 application or task for which the tool is used, the acceptable voltage performance, and even the
9 ambient temperature" were not provided in the patent; and noting that "the Federal Circuit has
10 rebuffed similar attempts to manufacture indefiniteness from the failure to prescribe the precise
11 parameters of testing functional limitations."); *Erfindergemeinschaft UroPep GbR v. Eli Lilly*
12 *and Co.*, 240 F.Supp.3d 605, 633 (E.D. Tex. 2017) (finding that even if some experimental
13 measurements of claimed values may be difficult to calculate with precision, this does not render
14 the claim language indefinite).  Here, Defendants are similarly trying to manufacture
15 indefiniteness from the alleged absence of precision in the disputed testing parameters.

**The Testing Parameters Are Known Or Immaterial For Scored Flexural Strength**

17       Even though a dispute over the precision of the testing parameters does not rise to a
18 finding of indefiniteness under the analysis of the cases discussed above, Pacific Coast disputes
19 that the identified testing parameters are not known by one of the skill in the art and/or are
20 immaterial in the testing methodology for scored flexural strength.  First, how deep to score the
21 drywall before testing for scored flexural strength is explicitly set forth in claim 21 and is well-
22 known in the art.  As claim 21 states, the scored flexural strength is "the flexural strength of the
23 laminated structure after the outer, paper-clad surface of one of the first and second gypsum
24 boards has been scored."  Scoring through the paper is the critical aspect, and any additional
25 scoring into the gypsum core has a much smaller impact on a panel's scored flexural strength.
26 The graph below shows the average scored flexural strength measured in Dr. Miller's test for the
27 unscored samples as well as the scored samples.  The bar on the far left shows the unscored
28 samples, and as can be seen, the unscored flexural strength is between three and four times

greater than the scored flexural strengths (at any score depth). While there is some variation in the scored flexural strength for the scored samples, the variance is minor when appropriately shown on a chart next to the unscored flexural strength. Defendants used a similar chart in their response on p. 14, but tellingly left off the unscored test results in an attempt to over emphasize the score depth effect. Further, Dr. Miller's own testing results showed a lower scored flexural strength (20.7 lbs) for a shallower score (2.5 mm) than for the 3.5 mm deep score (21.0 lbs). His own testing shows that score depth does not materially affect the scored flexural strength if the outer paper is scored completely as required by claim 21.[4]



Second, the testing parameter regarding the different orientations to test the board is immaterial when conducting a scored flexural strength test. In his declaration and deposition testimony, Dr. Miller confirmed that the differences in the flexural strength for the different orientations was caused by the direction of the fibers in the outer paper of the boards,[5] and once these outer paper fibers on the surface are scored, their orientation no longer plays a role in the board's scored flexural strength.

Finally, the testing parameter of how to convert the scored flexural strength measurement for a 5/8" thick panel to ½" thickness is a red herring raised by Defendants' counsel in an effort to cloud a straightforward issue. First, the language of claim 21 is important here—the scored flexural strength is "about 22 pounds *per ½ inch thickness of the structure*. The claim language

---

[4] Defendants also cite to the prosecution history in an effort to show that persons of ordinary skill in the art vary score depth to make materials easier to break (response p. 9), but this citation from the prosecution history was referring to gypsum fiberboard, an entirely different product than gypsum drywall, which does not score and snap due to paper fibers being embedded throughout the product.

[5] Dr. Miller opined in his declaration and confirmed in his deposition that the paper fiber orientation in the outer papers is what caused the flexural strength differences in the different orientations as discussed in Pacific Coast's Opening Brief. (*See* Gafford Ex. 11, 223:2–12); (Gafford Ex. 9, ¶¶ 21, 61–63).

clearly states that any measurement of scored flexural strength must be converted to pounds per ½" thickness, so Defendants' bald assertion that a conversion between thicknesses is taught against by the patent specification due to it reporting separate values for separate thicknesses is disingenuous. What Defendants are actually asserting is that only ½" thick products could ever potentially infringe claim 21 because conversions between thicknesses are not allowed. This ridiculous argument completely ignores the plain language of the claim and must be disregarded.

The question then becomes, what is the appropriate way to convert between thicknesses. As shown in the graph on page 15 of Pacific Coast's opening brief, the flexural strength values from ASTM test standard C 1396 have a linear relationship. This is further supported by the 2017 ASTM test standard C 1396, which explicitly allows for interpolation between values.[6] (Gafford Decl. Ex. 13). Dr. Miller tries to introduce another PSI calculation to convert between thicknesses, but he, nor Defendants, offer any relevant support to show that one skilled in the art would use a PSI calculation for gypsum panels. The support given for the PSI calculation is from test standards for "other, non-gypsum building materials (like wood and plastic)." (Dkt. No. 82, p. 15). This PSI calculation ignores the actual ASTM test standards for gypsum building materials—the relevant materials at issue here—and should be disregarded.[7]

Defendants' argument about the slope of this linear relationship shows a fundamental misunderstanding of simple math and the necessary physical characteristics of the products at issue. For example, compare Defendants' made up diagram on page 16 of their response to Pacific Coast's diagram constructed from actual numbers from the ASTM test standard on page 15 of the opening brief. Defendants' diagram shows three lines converging from a known point as they approach 0.0" thickness. The product represented by the top line would have roughly 30

---

[6] Defendants' contention that it doesn't allow for interpolation between values that are stated in the chart is immaterial. Pacific Coast is only citing this to reinforce that the relationship between thickness and flexural strength is linear, which it has to be if interpolation between values is allowed.

[7] Defendants attempt to show that the values obtained using the PSI calculation differ from the values obtained using linear interpolation, which only supports Pacific Coast's position that linear interpolation is the appropriate standard. The fact that another unsupported method, that has never been used for gypsum products, does not match the accepted method is of no import.

pounds of flexural strength when it has a thickness of 0.0", which is nonsensical—a product with no thickness cannot have any flexural strength. The product represented by the bottom line would have 0 pounds of flexural strength at roughly 3/8" thickness, which is also nonsensical. Pacific Coast's diagram, on the other hand, makes complete sense as both lines shown converge at 0 pounds of flexural strength at 0.0" thickness.[8] Once the measured value for 5/8" thickness is found, while knowing that 0,0 is another point on the same line, simple cross multiplication can be used to convert the measured value of the 5/8" thickness to a ½" thickness. Using this simple formula to convert Dr. Miller's measurements provides the 23.5 pounds value, which is in line with the "about 22 pounds" limitation from claim 21.

**Defendants' Narrowing Of "About" Is Impermissible**

Defendants misconstrue Pacific Coast's opening brief regarding Pacific Coast's proposal for the term "about" from claim 21—at no point did Pacific Coast argue that "about 22 pounds" should mean "anything less than 50 pounds" as Defendants allege on page 19 of their response. Pacific Coast discussed the less than 50 pounds in its opening brief, which came directly from the specification of the '568 patent, to demonstrate that the range of allowable score and snap values for scored flexural strength is anything less than 50 pounds.

Pacific Coast's actual proposed construction for "about 22 pounds" is approximately the range of 10-34 pounds, which is supported by the ASTM test standard and significantly less than the 50 allowable pounds from the patent specification. Defendants tries to limit the meaning of "about" to a narrow range from the testing performed in the patent's specification as represented in Figure 3 (shown above). Ironically, Defendants argue in their response that the average value of a product's scored flexural strength is inappropriate, but then attempt to limit the range to this same average value plus or minus one standard deviation of that average. Defendants' selective use of the patent specification is transparent, and the narrowly tailored proposed range is disingenuous in light of the industry standards regarding an appropriate range.

---

[8] To prove this, one can take a ruler and a pencil and place the ruler on 0,0 of the graph and the last plotted point and draw a straight line that follows the plotted line.

The ASTM standard referenced in the patent specification regarding the testing method for scored flexural strength provides an actual 95% confidence interval, given in terms of a plus/minus value in pounds, for the flexural strength testing.  (Gafford Ex. 14, p. 6).  These given, industry-standard intervals range from ± 7.370 lbf to ± 19.429 lbf depending on the orientation of the test, and have an average value of approximately ± 12 lbf.  This is supported by the *Ortho-McNeil* case cited by Defendants, which Defendants cited for the proposition that "the qualifier 'about' is narrow."   The case actually provides that the "range must be interpreted in its technological … context" and "extrinsic evidence of meaning and usage in the art may be helpful."  *Ortho-McNeil Pharm. Inc. v. Caraco Pharm. Labs, Ltd.*, 476 F.3d 1321, 1326 (Fed. Cir. 2007).  *See also In re Wertheim,* 541 F.2d 257, 262 (C.C.P.A. 1976) (the meaning of the word "about" is dependent on the facts of a case, the nature of the invention, and the knowledge imparted by the totality of the earlier disclosure to those skilled in the art).  The industry standard for the invention at issue provides the acceptable range to have a 95% confidence interval, and this is what the Court should adopt.  Lastly, Dr. Miller's failure to acknowledge these error margins, make his own testing results appear more divergent than they really are.  *See Erfindergemeinschaft*, 240 F.Supp.3d at 629.

### B.     "Inner Surface" Is A Portion Of The Interior Facing Surface

| Claim Term | Pacific Coast's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| inner surface (claim 21) | The portion of the face of the gypsum board in the interior of the laminated structure that when clad provides flexural strength | Plain and ordinary meaning |

Defendants' proposed claim construction of plain and ordinary meaning for the term "inner surface" from claim 21 of the '568 patent ignores black letter patent law regarding the effect of the term "comprising" and seeks to impermissibly narrow the claim.  Pacific Coast's proposed construction of "the portion of the face of the gypsum board in the interior of the laminated structure that when clad provides flexural strength" is supported when the term "inner surface" is read in conjunction with the entirety of claim 21.  For example, claim 21 provides in

part "a first gypsum board having *two surfaces*, the first of said two surfaces comprising an outer, paper-clad surface and the *second of said two surfaces comprising an inner surface*, wherein the entire inner surface of the first gypsum board is unclad."  The language of the claim is clear—the gypsum board has two surfaces and the second surface *comprises* an inner surface.  The transitional term "comprising," which is synonymous with "including," "containing," or "characterized by," is inclusive or open-ended and does not exclude additional, unrecited elements or method steps.  MPEP, 9th Ed., Rev. 08-2017, § 2111.03.  *See also Mars Inc. v. H.J. Heinz Co.*, 377 F.3d 1369, 1376 (Fed. Cir. 2004); *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997) ("Comprising" is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim); *Regeneron Pharm., Inc. v. Merus N.V.*, 864 F.3d 1343, 1352 (Fed. Cir. 2017) (same); *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 67 F.Supp.3d 1100, 1124 (N.D. Cal. 2014) (same).  In *Heinz*, the claim at issue stated in part:

> a soft inner component of a dual texture pet or animal food product *containing a mixture of lipid and solid ingredients*, the first component having a water activity, $a_w$, less than about 0.65 and a total moisture content less than about 15 wt %.

*Mars v. Heinz*, 377 F.3d at 1372.  The Federal Circuit ruled that the term "containing" was similar to "comprising," which made the claim term open-ended, and that additional, unnamed ingredients were not excluded from being included.  *Id.* at 1376.

Similarly here, the second surface comprises "an inner surface," but the second surface is not limited to only having that inner surface.  Defendants attempt to inappropriately limit the "second surface" to only include the "inner surface" is not congruent with the plain language of claim 21.  Defendants' argument that allowing the "second surface" to be open-ended and include additional elements (as it is written) would render the "entire" portion of the limitation meaningless is simply inconsistent with the patent specification and prosecution history.  Defendants lone case citation to *Bicon* is inapposite as that case was dealing with whether the claim's preamble, which added several important limitations, was limiting and was not focused on the open-endedness of the term "comprising" as is the case here.  *Bicon, Inc. v. The Straumann Co.*, 441 F.3d 945, 950-51 (Fed. Cir. 2006).

1    First, Figure 1 from the patent shows the second surface with some cladding and the
2 inner surface with no cladding.  Reference numerals 104 and 105 refer to the "inner surface" of
3 the gypsum boards (shown in dotted lines) in the laminated panel that has had the face paper
4 removed to ensure a flexural strength of about 22 pounds, akin to standard drywall.  As can be
5 seen, the entire second surface of the gypsum boards are not without paper as the face paper
6 (shown in solid black line) wraps around the edges and onto the "second surface."  Under the

FIG. 1

14 Defendants' proposed construction, a laminated panel made consistent with Figure 1 would not
15 be covered by claim 21.  However, the specification clearly provides that the samples tested that
16 yielded the average scored flexural strength of 22 pounds as claimed in claim 21 and where the
17 inner surfaces 104 and 105 "do not have additional facing materials such as paper," were
18 "constructed consistent with FIG. 1."  (Gafford Ex. 2, Col. 6, ll. 35-39).

19    Second, Defendants mischaracterize the prosecution history of the '568 patent regarding
20 the inclusion of the limitation "wherein the entire inner surface of the first gypsum board is
21 unclad."  Specifically, the applicant explains that "the examiner focuses on prior art gypsum
22 boards with both surfaces being paper-clad or unclad, but the rejection is silent on the reasons to
23 have only the outer surface paper-clad but the inner surface unclad <u>as recited in claim 1</u>.[9]"  (Dkt.
24 No. 82, Rives Ex. F, '691 Appl., Reply to Office Action, p. 15 (July 30, 2013) (emphasis added).
25 The key phrase is "as recited in claim 1," which as discussed above is open-ended after
26 following the term "comprising" and as supported by the as-filed Figure 1 and the specification.

---

[9] Claim 1 in the prosecution of the application ultimately issued as claim 21, the asserted claim.

1  Moreover, none of the cited prior art disclosed an "inner surface" (or "second surface" for that
2  matter) that had some, but less than entire coverage of paper as explained by the applicant in the
3  quote above when referencing "both surfaces being paper-clad or unclad." The prior art
4  references either had paper cladding on both surfaces or were non-gypsum wallboard products
5  with no paper cladding on either side. The word "entire" was not added to the claim to
6  overcome any rejection for prior art showing some, but not all, paper cladding on an interior
7  surface.[10]

8  Even if the prosecution history is ambiguous as to why "entire" was added, it is
9  inappropriate limit a broader claim term based on prosecution history that is itself ambiguous.
10 *See Mars v. Heinz*, 377 F.3d at 1377. And while Pacific Coast's own commercially available
11 product has no paper on the entire second surface, claim 21 is not limited to this commercial
12 embodiment. *See Gillete Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1371 (Fed. Cir. 2005)
13 ("a patentee typically claims broadly enough to cover less preferred embodiments as well as
14 more preferred embodiments, precisely to block competitors from marketing less than optimal
15 versions of the claimed invention.").

16 The use of the word "comprising" here in claim 21 supports Pacific Coast's proposed
17 construction that the "inner surface" is "the portion of the face of gypsum board … that when
18 clad provides flexural strength." In other words, "inner surface" is not limited to meaning only
19 the entire second surface of the gypsum board, which is why the plain and ordinary meaning of
20 "inner surface" is not proper.

21 **III.   CONCLUSION**

22 For the reasons stated in Pacific Coast's opening claim construction brief and herein,
23 Pacific Coast respectfully requests that the Court adopt its proposed constructions and reject
24 Defendants' unsupported definitions.

---

[10] On page 3 of Defendants' response, Defendants state that the "prior art disclosed laminated, sound-attenuating gypsum structures where two boards are glued together and the prior art also disclosed boards with unclad (i.e., without paper) surfaces." (Dkt. No. 82, p. 3). To be clear, the prior art did NOT include any laminated, sound-attenuating structures made from boards with unclad surfaces.

Dated: October 19, 2018

Respectfully submitted,

SHEPPARD MULLIN RICHTER & HAMPTON, LLP

By: */s/ Jason E. Mueller*
Jason E. Mueller

Attorneys for Plaintiff and Counterdefendant
PACIFIC COAST BUILDING PRODUCTS, INC.